IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JASON L. ZULLINGER, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| vs. | : | No. 1-10-cv-1450 |
| | : | |
| YORK COUNTY CCC HALFWAY | : | |
| HOUSE, et al., | : | |
| Defendants | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                June 3, 2013

Jason Zullinger brings this civil rights action against the York Community Corrections Center ("YCCC") and several female members of its staff alleging various violations of his constitutional rights. Mr. Zullinger claims that while residing at YCCC, he was deprived of property without due process of law and was unlawfully searched, humiliated, and embarrassed all in violation of his right to privacy, his right not to be subjected to illegal searches, and his right not to be subjected to cruel and unusual punishment. The defendants filed a motion for summary judgment to which the plaintiff responded. For the following reasons, I will grant the motion in its entirety.

**I. BACKGROUND**

On April 1, 2008, after pleading guilty to a charge of Driving Under the Influence ("DUI"), Mr. Zullinger was sentenced to twenty-four months in state prison. See Zullinger Dep. at 15. He had been previously cited multiple times for other DUI incidents, and he admitted that he has a problem with excessive drinking. Id. at 18-19. On June 20, 2008, Mr. Zullinger applied for and was admitted to the State Intermediate

Punishment ("SIP") Program,[1] a program of the Commonwealth of Pennsylvania. On July 13, 2008, Mr. Zullinger was transferred from SCI Camp Hill to SCI Chester. As part of the SIP program, Mr. Zullinger was released to proceed to the next phase which consisted of sixty days of inpatient rehabilitation at ADAPPT,[2] a private facility in Reading, Pennsylvania. See Zullinger Dep. 17. On July 13, 2009, Mr. Zullinger was transferred from ADAPPT to YCCC[3] where he served the remainder of his twenty-four month sentence. Id. at 17. Mr. Zullinger was never paroled. Id. at 18.

YCCC is "wholly operated and managed" by the Commonwealth's Department of Corrections. See Sommers Declaration at ¶ 4. At YCCC, Mr. Zullinger gave urine specimens in a bathroom that measured four feet by eight feet. The bathroom was located on the first floor and contained a sink, a toilet, and a mirror that was angled so that urination could be observed. See Zullinger Dep. at 38-40; see also Zullinger Dep.

---

[1] According to a brochure issued by Pennsylvania's Department of Corrections, "the State Intermediate Punishment Program provides an option in state prison sentencing for those offenders who have alcohol or other drug issues where the offense was motivated by their use of alcohol or other drugs, have less serious offenses, and who would have received a sentence of 30 months or more. If an offender qualifies for the SIP program, they are sentenced to a 24 month flat sentence and participate in an individualized treatment plan that involves limited time spent in an adult correctional facility in a therapeutic community, and the remaining portion of the sentence provides them with in-patient and out-patient therapy out in the community. The offender remains under supervision while getting beneficial treatment to assist them with overcoming their addiction." www.portal.state.pa.us/portal/server.pt/document/916060/ccc_pdf.

[2] ADAPPT is not part of the Commonwealth's Department of Corrections. It is a privately owned corporation that treats drug and alcohol addictions and falls into the same category as parole or probation, in that the residents have the same restrictions as parole or probation, and are no longer incarcerated in an SCI facility.

[3] In contrast to ADAPPT, YCCC is part of the Commonwealth's Department of Corrections. It is a halfway house, employing "monitoring staff" as opposed to "guards," and among the staff's duties are counting the inpatient residents, and taking urine and breath tests of the residents.

2

Ex. 5. At least one monitor was present in the bathroom with Mr. Zullinger while he was urinating. At the time of Mr. Zullinger's incarceration, YCCC did not have any male monitors. See Zullinger Dep. at 87-88.

Mr. Zullinger was always clothed when he provided urine samples. Id. at 72-74. According to Mr. Zullinger, Defendant Stover, a YCCC monitor, once made a derogatory comment about the size of Mr. Zullinger's penis while she was observing him urinate. Id. at 54.

While at ADAPPT, Mr. Zullinger worked at the Outback Steakhouse in Wyomissing, Pennsylvania. Id. at 56. When Mr. Zullinger learned that he was being transferred to YCCC, he spoke with the manager at the Wyomissing Outback about a possible transfer to the Outback Steakhouse in York, Pennsylvania. Id. at 58. Mr. Zullinger never spoke to the manager at the York Outback. Id. at 59. However, Mr. Zullinger's counselor at YCCC, Defendant Maxine Stanley, refused to allow Mr. Zullinger to apply for a job at the York Outback Steakhouse because that particular location served alcohol. See Stanley Dep. at 84-85. Miss Stanley approved Mr. Zullinger for several other jobs.

Mr. Zullinger filed a three-count complaint in this court. Count One brings a claim against Defendant Stanley for the deprivation of his procedural due process rights for allegedly forcing him to terminate his employment at the Outback Steakhouse in York. Count Two brings a claim against YCCC itself for engaging "in a custom, practice, and policy of unlawfully using female employees to regularly take urine samples from male inmates." Finally, Count Three brings a claim against six individual

female staff members at YCCC for "personally peer[ing] at and view[ing] the plaintiff's genitals, more specifically his penis, as he urinated in a cup." He contends that these urine examinations violated his rights against unlawful searches, his rights to privacy, and his Eighth Amendment right to be free of cruel and unusual punishments.

## II. STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. FED.R.CIV.P. 56(c)(1)(A). That is, summary judgment is appropriate if

4

the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

Under 42 U.S.C. § 1983, a private party may recover in an action against any person acting under the color of state law who deprives the party of his or her constitutional rights. In order to succeed on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) the violation of a right secured by the Constitution, and (2) that the constitutional deprivation was committed by a person acting under the color of state law.[4] West v. Atkins, 487 U.S. 42, 48 (1988).

---

[4] Because I find no constitutional violations here, I need not consider whether the individual defendants were acting under the color of state law. See Robinson v. Temple University Health System, 2012 U.S. App. LEXIS 25383 at *4 (3d Cir. Dec. 12, 2012).

5

**A. Count One**

1. Procedural Due Process Claim

Mr. Zullinger first claims that he had a property right to work at the York Outback Steakhouse, and that Miss Stanley deprived him of this property right without procedural due process. The Fourteenth Amendment prohibits deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In evaluating a procedural due process claim, a court must determine, first, whether the asserted individual interest is encompassed within the Fourteenth Amendment's protection of life, liberty, or property and, if so, whether the procedures available provided the plaintiff with due process of law. Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).

Thus, Mr. Zullinger must demonstrate that he had a protected interest in having a job at Outback Steakhouse in York. Kline v. City of Sunbury, 2007 U.S. Dist. LEXIS 79960, *6 (M.D. Pa. Oct. 29, 2007) (if no property interest exists, it is obviously unnecessary to analyze what procedures were followed). To have a property interest in a job, person must have more than a unilateral expectation of continued employment. He must have a legitimate entitlement to such continued employment. Hill, 455 F.3d at 234. Whether a person has a legitimate entitlement to -- and hence a property interest in -- his job is a question answered by state law. Id. "The decisional law is clear that an at-will employee does not have a legitimate entitlement to continued employment because he serves solely at the pleasure of his employer." Id.

Here, Mr. Zullinger worked as a server at the Outback Steakhouse in Wyomissing. When he became aware of his transfer to York CCC, he had a single conversation with his manager at the Wyomissing Outback Steakhouse about the possibility of transferring to the York Outback Steakhouse. Mr. Zullinger neither spoke with the manager in York nor actually secured employment there. Given these circumstances, Mr. Zullinger cannot establish that he had a legitimate entitlement to employment as a server at the Outback Steakhouse in York, or that he had a property interest in such employment.[5] Accordingly, I will grant summary judgment in Miss Stanley's favor on the procedural due process claim.

### 2. Potential Substantive Due Process Claim

I note that Mr. Zullinger also alleges that he has a Fourteenth Amendment right "not to suffer arbitrary and capricious charges in terms and conditions of parole dictated by a halfway house manager without any court order." To the extent that this allegation is an attempt to assert a substantive due process claim, that also must fail. To prevail on a substantive due process claim, a plaintiff must establish that he has a fundamental right that is protected from arbitrary or irrational deprivation. County of Sacramento v. Lewis,

---

[5] Even if Mr. Zullinger had presented facts that established a legitimate entitlement to employment with the York Outback Steakhouse, such as a binding employment contract, he would not have had a protectable interest in his employment. Third Circuit case law holds that an inmate does not have a property or liberty interest in a particular prison job, see Bryan v. Werner 516 F.2d 233, 240 (3d Cir. 1975), or in any prison job at all, see James v. Quinlan, 866 F.2d 627, 630 (3d Cir. 1989), during the period of his incarceration. While those cases discuss prison jobs, the due process analysis applies with equal force to any employment during incarceration. Because Mr. Zullinger was incarcerated at the time Miss Stanley refused to allow him to work at the Outback Steakhouse in York, he did not have a property or liberty interest in holding any employment.

7

523 U.S. 833, 840 (1998); Nicholas v. Pennsylvania State University, 227 F.3d 133, 142 (3d Cir. 2000); see also Deblasio v. Zoning Board of Adjustment for the Township of West Amwell, 53 F.3d 592, 598 (3d Cir. 1995) ("[n]ot all property interests worthy of due process protections are protected by the concept of substantive due process"). As a matter of law, "employment is not a fundamental right, and therefore cannot be claimed as the subject of a substantive due process violation." Leibert v. Philadelphia Housing Authority, 474 Fed.Appx. 76, 79 (3d Cir. 2012) (citing Hill, 455 F.3d at 235 n.12); see also James v. Quinlan, 866 F.2d 627, 630 (3d Cir. 1989) (prisoners have no right to employment while incarcerated).

Even if the plaintiff's right to employment at Outback Steakhouse in York were fundamental, he has offered no proof that Miss Stanley's actions could "shock the conscience." United Artists Theatre Cir., Inc. v. Twp. of Warrington, 316 F.3d 392, 401 (3d Cir. 2003). Simply put, this standard encompasses "only the most egregious official conduct." Id. at 400; see also Lewis, 523 U.S. at 848, 849 (describing action that shocks the conscience as "conduct deliberately intended to injure in some way unjustifiable by any government interest"). At most, the evidence shows that the plaintiff may have been able to transfer to York but that Miss Stanley would not allow him to work there because alcohol is served at that location. Given the facts that the plaintiff had at least one DUI conviction, that he was incarcerated at the time, that he admitted to problems with excessive drinking, and that Miss Stanley approved several other jobs for him, Miss Stanley's actions could not be characterized as "conscience shocking." Accordingly, I will grant summary judgment in favor of Miss Stanley on Count One.

## B. Count Two

Mr. Zullinger next alleges that YCCC violated his constitutional rights. In response, the defendants argue that the YCCC is part of the Commonwealth of Pennsylvania, and is therefore immune from suit pursuant to the Eleventh Amendment of the United States Constitution and common law notions of sovereign immunity. I agree and find that under the Eleventh Amendment, YCCC is immune to suit.

The Supreme Court has consistently interpreted the Eleventh Amendment to preclude suits against a state or its agencies in federal court, by citizens of that state or other states. Atascadero State Hospital v. Scanlon, 473 U.S. 234, 238 (1985); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 98 (1984); Edelman v. Jordan, 415 U.S. 651, 662-63 (1974); Employees v. Department of Public Health and Welfare, 411 U.S. 279 (1973); Hans v. Louisiana, 134 U.S. 1 (1890). The Eleventh Amendment's jurisdictional bar, moreover, is not dependent upon the nature of the relief requested. It is applicable to suits seeking money damages as well as those seeking equitable relief. Edelman, supra; Alabama v. Pugh, 438 U.S. 781 (1978). And, while a state may consent to suit against it in federal court, Pennsylvania has not done so either generally or in this case. Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981); see also 42 Pa.C.S. § 8512(b).

The Pennsylvania Department of Corrections is immune from suit because it is an administrative agency without existence apart from the Commonwealth. Lavia v. PA Department of Corrections, 224 F.3d 190, 195 (3d Cir. 2000). Because YCCC is "wholly operated and managed" by the Department of Corrections, it is also entitled to immunity.

See Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 660 (3d Cir. 1989) (citing Kovats v. Rutgers, 822 F.2d 1303, 1306 (3d Cir. 1987)) ("wholly owned subsidiary" has sovereign immunity if and only if its parent has sovereign immunity).[6]

Thus, neither YCCC itself nor the other defendants in their official capacities may be sued under § 1983. See Will v. Michigan Department of State Police, 491 U.S. 58, 70 (1989) (state employees, in their official capacities cannot be subject to claims for damages brought pursuant to § 1983). Accordingly, I will enter summary judgment in favor of YCCC on Count Two.

### C. Count Three

#### 1. Fourth Amendment Right to Privacy

Finally, Mr. Zullinger argues that the six female staff members, whom he labels "inspection defendants," violated his constitutional rights by directly monitoring him while he urinated. He contends that being forced to have a woman see his genitals violated his Fourth Amendment right to privacy and his Eight Amendment right to be free from cruel and unusual punishment. Because I find that there was no constitutional violation, I will also grant summary judgment in favor of these defendants.

---

[6] I note that none of the three exceptions to 11th Amendment immunity is applicable here. First, the Commonwealth has not waived its immunity or unequivocally consented to be sued in federal court. Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000). Second, Section 1983 does not abrogate 11th Amendment immunity. See Seminole Tribe v. Florida, 517 U.S. 44 (1996); see also Quern v. Jordan, 440 U.S. 332 (1979). Third, Mr. Zullinger is seeking monetary relief for events that occurred in the past. See Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 269 (1997) (exception for where a plaintiff sues state officials in their official capacities seeking only prospective injunctive relief for a continuing violation of federal law).

A prisoner's constitutional rights are necessarily limited by the nature of the prisoner's confinement.  Turner v. Safley, 482 U.S. 78, 89 (1987).  The Fourth Amendment's prohibition against unreasonable searches and seizures remains in place in prisons, but the analysis of what is reasonable is affected by a prison's need to maintain order.  Bell v. Wolfish, 441 U.S. 520, 559 (1979).  To determine whether a search is reasonable, courts consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it was conducted." Id.  Prisons have the authority to limit the constitutional rights of inmates when necessary to maintain security, and courts must generally defer to prison officials' judgment regarding what policies are necessary for security reasons.  Id. at 545-547 (holding that prison administrators should be given "wide-ranging deference in [their] adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.")  Therefore, regulations that curtail inmates' constitutional rights are valid if they are "reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89.

Prison officials' use of investigative drug testing is reasonable under the Fourth Amendment "as long as there is any basis of justification."  Burgos v. Canino, 641 F. Supp. 2d 443, 461 (E.D. Pa. 2009), aff'd, 358 Fed. Appx. 302 (3d Cir. 2009); see also Madden v. Jacobs, No. 90-cv-0759, 1990 U.S. Dist. LEXIS 2645, *3 (E.D. Pa. Mar. 12, 1990) ("Urine testing furthers a legitimate government interest of rehabilitating prisoners and enforcing the law; [so] it is not unreasonable intrusion of the plaintiff's privacy rights.")

The Sixth Circuit recently concluded that direct observation of a pretrial detainee producing a urine sample does not violate the Fourth Amendment. Norris v. Premier Integrity Solutions, Inc., 641 F.3d 695, 700-701 (6th Cir. 2011). The court balanced the various factors, and concluded that the government's interest "in insuring the accuracy of the drug testing" outweighed the inmate's "significantly reduced expectation of privacy." Id. The court's decision in Norris, however, did not address whether direct observation by a monitor of the opposite gender would violate the Fourth Amendment.

Direct opposite gender observation does raise some concern. The Eleventh Circuit Court of Appeals recently recognized a prisoner's constitutional right to bodily privacy, because "most people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir. 1993) (citing Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981); see also Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir. 1992) (concluding that "we have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context"); Sepulveda v. Ramirez, 967 F.2d 1413, 1415 (9th Cir. 1992) (recognizing that prison inmates retain the right to bodily privacy); Michenfelder v. Sumner, 860 F.2d 328, 333-334 (9th Cir. 1988) (same).

Direct observation of a female parolee by a male parole officer has been held to present a legally sufficient Fourth Amendment claim. See Sepulveda, 967 F.2d at 1416. I am not persuaded, however, that the same is true here. The Seventh Circuit Court of Appeals has held that privacy concerns are greatly reduced when it is direct observation
12

of males by females rather than observation of females by males.  Dimeo v. Griffin, 943 F.2d 679, 682 (7th Cir. 1991) (noting that "for most men" urination is "not highly private," as demonstrated by lack of partitions between urinals in public restrooms). Further, an incarcerated person such as Mr. Zullinger retains fewer legitimate expectations of privacy than a parolee, such as Miss Sepulveda.  Brown v. Plata, 131 S.Ct. 1910, 1964 (2011) ("the legitimate privacy expectations of inmates are greatly diminished.")  I also note that male inmates' right to privacy competes with female monitors' rights to equal protection and nondiscrimination in employment.  See Johnson v. Phelan, 69 F.3d 144, 146-147 (7th Cir. 1995) (in light of Title VII, female guards are entitled to participate in the normal activities of guarding, including pat-down searches of male inmates).

Due to the government's legitimate interest in the accuracy of Mr. Zullinger's urine test, Mr. Zullinger's greatly reduced expectation of privacy as an inmate, and the lessened cultural taboo on male urination in view of others, I will defer to the judgment of YCCC's administrators, and find that the inspection defendants did not violate Mr. Zullinger's right to privacy.[7]

---

[7] Even if these defendants violated Mr. Zullinger's right to privacy, they would be entitled to qualified immunity because the right of a male inmate to be free from direct observation by a female monitor during a urine sample was not clearly established.  See Kornegay v. Cottingham, 120 F.3d 392, 396 (3d Cir. 1997) ("Clearly established rights are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right); Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) (qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition").

## 2. Eighth Amendment

The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments on those convicted of crimes. Robinson v. California, 370 U.S. 660 (1962). It is well-established that the Eighth Amendment provides protection to inmates beyond that provided by the Fourth Amendment, but only in extreme circumstances. See Hudson v. Palmer, 468 U.S. 517, 530 (1984). The Constitution does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Wilson v. Seiter, 501 U.S. 294, 298 (1991). Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny. Whitley v. Albers, 475 U.S. 312, 319 (1986). In order to prevail on a constitutional claim of cruel and unusual punishment, a plaintiff must satisfy both the objective and subjective requirements for an Eighth Amendment action pursuant to 42 U.S.C. § 1983. Wilson, 501 U.S. at 298. After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Id. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Whitley, 475 U.S. at 319.

Resolution of an Eighth Amendment claim therefore mandates an inquiry into a prison official's state of mind.  Wilson, 501 U.S. at 299.  Two considerations define that inquiry.  A court must first determine if the deprivation or injury was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298.  If not, the inquiry is at an end.  However, if the deprivation or injury is sufficiently serious, the court must proceed to determine if the officials acted with a sufficiently culpable state of mind.  Id.  In other words, the court must determine if they were motivated by a desire to inflict unnecessary and wanton pain.  What is necessary to establish an unnecessary and wanton infliction of pain varies according to the nature of the alleged constitutional violation.  Hudson v. McMillian, 503 U.S. 1, 5 (1992).  The objective inquiry is whether the inmate was "denied the minimal civilized measure of life's necessities." Id. at 9.

Preliminarily, I note that the female monitors' direct observation of Mr. Zullinger's urine tests does not rise to the level of "sufficiently serious" to satisfy the objective component of an Eighth Amendment claim.  Mr. Zullinger gave urine specimens in a bathroom that contained a sink, a toilet, and a mirror that was angled so that urination could be observed by the monitor from behind.  Mr. Zullinger was always fully clothed when he provided the samples.  Urine testing at YCCC is a necessary and reasonable component to support the safety of the staff and those incarcerated.  Under these circumstances, it cannot be said that undergoing this procedure denied Mr. Zullinger the minimal civilized measure of life's necessities.  Accordingly, I find that Mr. Zullinger's Eighth Amendment claim must also fail, and I will grant summary judgment on behalf of the six female monitor defendants.

However, even if the urine test procedure were considered sufficiently serious to satisfy the objective component, Mr. Zullinger cannot demonstrate that the individual defendants had a "sufficiently culpable state of mind" to satisfy the subjective component to prevail. Given the totality of the circumstances here, the collection of urine specimens by opposite gender monitors at YCCC falls short of supporting a finding that prison officials acted "maliciously and sadistically to cause harm" in allowing direct observation by opposite gender monitors. Indeed, only one of the individual defendants, namely Miss Stover, could be considered to have acted with the intent to humiliate Mr. Zullinger by commenting on the size of his genitalia. It is well settled, however, that verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment, even when the harassment is of a sexual nature. Robinson v. Taylor, 204 Fed. Appx. 155, 156 (3d Cir. 2006).

An appropriate Order follows.